UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MARTIN G. DECKER,                                 :

                Plaintiff,             :   11 Civ. 5593 (PGG) (GWG)

   -v.-                                                :   REPORT AND RECOMMENDATION

MICHAEL J. ASTRUE, Commissioner of       :
Social Security,
                                                           :
              Defendant.
-------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Martin Decker brings this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of the final decision of the Commissioner of Social Security denying his claim

for disability insurance benefits under the Social Security Act.  Decker moved for judgment on

the pleadings pursuant to Fed. R Civ. P. 12(c), and the Commissioner has cross-moved for

judgment on the pleadings.[1]  For the reasons stated below, the Commissioner's motion should be

granted, and Decker's motion should be denied.

---

[1]  See Notice of Motion for Judgment on the Pleadings, filed Apr. 17, 2012 (Docket # 11); Plaintiff's Memorandum of Law in Support of a Motion for Judgment on the Administrative Record and Pleadings Pursuant to Rule 12(c) F.R.C.P., filed Apr. 17, 2012 (Docket # 12) ("Pl. Mem."); Notice of Cross-Motion, filed May 23, 2012 (Docket # 14); Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, filed May 23, 2012 (Docket # 15) ("Comm. Mem."); Plaintiff's Reply Memorandum of Law in Opposition to the Commissioner's Cross-Motion for Remand for Further Administrative Proceedings and in Support of Plaintiff's Motion for Judgment on the Administrative Record and Pleadings Pursuant to Rule 12(c) F.R.C.P., filed June 7, 2012 (Docket # 16) ("Pl. Reply"); Memorandum of Law in Further Support of the Commissioner's Motion for Judgment on the Pleadings, filed June 29, 2012 (Docket # 18).

I.      BACKGROUND

        A.      Administrative Proceedings and Procedural History

        Decker applied for social security disability and social security insurance benefits on

January 10, 2008, see Administrative Record (annexed to Notice of Filing of Administrative

Record, filed Jan. 31, 2012 (Docket # 8)) ("R.") 124, alleging that he became disabled on

November 20, 2006, R. 117.[2]  Decker was insured through December 31, 2011.  R. 14.  He most

recently worked in plumbing at a plumbing warehouse and had previously worked in a metal

shop cutting steel, as a forklift operator, as a truck driver, as a factory laborer, and as a bed

assembler.  R. 29–32.

        Following a hearing before an ALJ on November 17, 2009, R. 22–63, Decker's

application was denied on December 9, 2009.  R. 14–21.  Decker appealed the ALJ's ruling.  R.

114–16.  On June 17, 2011, the Appeals Council denied Decker's request for review.  R. 1–4.

On August 11, 2011, Decker filed the instant action seeking review of the ALJ's decision.  See

Complaint, filed Aug. 11, 2011 (Docket # 1).

---

        [2]  While at one point in his brief, Decker gives March 23, 2003, as the date he was first
unable to work, Pl. Mem. at 4, documents in the record indicate that Decker has asserted he
became unable to work on November 20, 2006.  See, e.g., R. 117, 155.  During a hearing on
November 17, 2009, Administrative Law Judge ("ALJ") Robert Gonzalez referred to Decker's
injury date as November 22, 2006, although that date does not appear elsewhere.  R. 27.

B.     The Administrative Record

    1.     Medical Records

        a.     Background

Decker was born in 1977.  He has suffered from asthma since 1982, and in 1996 he was diagnosed with Type I Diabetes Mellitus.  On November 20, 2006, he stopped working due to problems with his back.

        b.     Records Prior to November 20, 2006

Dr. David Schwalb of Liberty Medical Group treated Decker's diabetes from January 2003 through February 2004.  R. 316–20, 324.  When he first began treatment, Decker was "quite noncompliant with his treatment."  R. 324.  He generally improved under the care of Dr. Schwalb, although in December 2003, he was sent to the emergency room after Dr. Schwalb diagnosed the beginnings of diabetic ketoacidosis.[3]  R. 317.  At his next appointment with Dr. Schwalb in February 2004, Decker was feeling "much, much better."  R. 316.

Decker also saw Dennis Waxman, a physician's assistant at Liberty Medical Group, beginning in April 2003.  R. 321–23.  PA Waxman treated Decker for diabetes, sinusitis and bronchitis.  R. 321.  PA Waxman continued to treat Decker through the period at issue.  R. 212–14, 219–23, 302–08, 339, 360–61.

Decker was treated at Catskill Regional Medical Center in December 2003 for diabetic ketoacidosis.  R. 227–45.  He was treated in the emergency room there again in October 2006 for high blood sugar, and was released in stable condition.  R. 248–50.

---

[3]  Diabetic ketoacidosis is an "increase in the concentration of hydrogen ions in the arterial blood above the normal level," "caused by the enhanced production of ketone bodies."  Stedman's Medical Dictionary 15, 947 (27th ed. 2000) ("Stedman's").

c.   Records from the Period at Issue

On November 26, 2006, several days after he stopped working, R. 27, Decker sought

treatment at the emergency room of Catskill Regional Medical Center for "moderate pain in the

lower back," R. 208.  Decker stated at that time that he had experienced lower back pain

intermittently in the previous three weeks, and that it had been worse for the past two days.  Id.

He exhibited a "diffusely tender paralumbar area" with "mild spasm."  Id.  His sensation was

intact bilaterally and he had normal strength in the extension of the knees, plantar, and

dorsiflexion of the toes.  Id.  His condition was "stable."  R. 209.  Decker received a form from

the emergency room excusing him from work until November 30, 2006.  R. 215.

Decker continued to see PA Waxman, and on November 29, 2006, he received a form

from PA Waxman excusing him from work until December 5, 2006 and recommending

"moderate duty[,] . . . no heavy lifting, pushing or pulling."  R. 214.  On December 5, 2006, X-

rays of Decker's lumbar spine showed normal vertebral body alignment and vertebral body

height, no evidence of anterolisthesis,[4] and no significant abnormality in the soft tissues.  R. 339.

That same day, PA Waxman signed another form excusing Decker from work until December

10, 2006.  R. 213.  On December 11, 2006, PA Waxman signed another form excusing Decker

from work until January 10, 2007.  R. 212.

In April 2007, Decker saw PA Waxman, who noted that Decker's diabetes was under

"poor control," and that he had low back pain with radiculopathy.[5]  R. 220, 305.  Decker saw PA

---

[4]  Anterolisthesis is a form of spondylolisthesis.  Spondylolisthesis involves a "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum."  Stedman's at 1678.

[5]  Radiculopathy is a "disorder of the spinal nerve roots."  Stedman's at 1503.

4

Waxman periodically in 2008 and in May 2009 for treatment of his diabetes.  R. 219, 302–04, 360, 361.

Decker saw Dr. Neal R. Dunkelman from July 2007 through March 2008 for treatment of his back pain.  R. 200–04, 217, 267, 276, 397.  On July 10, 2007, Decker exhibited paralumbar tenderness and spasm, and straight leg raising was painful bilaterally.  R. 204.  Lumbar flexion was to 20 degrees.  Id.  In August 2007, lumbar flexion was to 30 degrees, and Dr. Dunkelman noted that Decker "reports sitting and standing tolerance of less than 5 minutes."  R. 202–03.  A report from September 2007 notes lumbar flexion to 20 degrees, R. 201, and an October report indicates "restricted lumbar range of motion" and "straight leg raising positive bilaterally," R. 200.  Results from a March 2008 magnetic resonance imaging ("MRI") test ordered by Dr. Dunkelman showed "no evidence of acute compression fractures nor retropulsed fragments," "normal stature and alignment" of vertebral bodies, "adequate disc height and hydration," with "mild central and bilateral broad-based bulge of the posterior annulus" at the L5-S1 level and "very minimal broad-based bulge of the posterior annulus" at the L4-L5 level."  R. 267, 276, 397.  The MRI revealed no "significant canal or foraminal compromise."  R. 267, 276, 397.

On March 24, 2008, Dr. Steven Rocker examined Decker upon referral by the Division of Disability Determination.  R. 251–60.  Dr. Rocker reported submaximal effort on the pulmonary function test, with best efforts showing moderate obstruction.  R. 254.  Dr. Rocker found that Decker had normal gait, could walk on his heels and toes without difficulty, and could squat to 30 percent.  R. 252.  Dr. Rocker noted "slight difficulty sitting up from a lying position," range of motion of the lumbosacral spine limited to 30 degrees forward, 20 degrees right and left lateral flexion, and 30 degrees right and left rotation.  R. 253.  Straight leg raising bilaterally at 30 degrees elicited pain in sitting and lying position, without radicular symptoms.  Id.  All other

5

aspects of the exam were normal.  R. 251–54.  Dr. Rocker diagnosed low back pain, a history of

diabetes mellitus with no evidence of end organ damage, and asthma "as per history."  R. 254.

He stated that Decker had mild limitation for sitting, standing, walking, lifting and carrying.  Id.

He had no limitations for hearing, speaking and handling.  Id.

In March 2008, Decker underwent physical therapy at Advanced Health and Medical.  R.

261–66, 269–75.

Decker saw two doctors at the Pain Control Center from May 2008 to September 2009.

Dr. Omar Hussein diagnosed Decker with "thoracic or lumbosacral neuritis[6] or radiculitis

unspecified," "degeneration of lumbar or lumbosacral intervertebral disc," "sacroiliac sprain,"

and "diabetes with neurological manifestations . . . not stated as uncontrolled."  R. 293, 445, 451.

Decker received injections from Dr. Hussein on June 3 and July 22 of 2008.  R. 296–97, 300–01,

437–38, 441–42.  On June 30, 2008, an MRI of Decker's spine showed "normal vertebral body

alignment," "no significant disc space narrowing," "no significant central canal or neural

foraminal stenosis at any level," "mild disc osteophyte[7] complex at T3–T4," and "no evidence of

cord signal abnormality."  R. 490.  Decker received a discogram on August 19, 2008, from Dr.

Mahmoud Abu-Ghanam.  R. 433–34.  At L3-L4, L4-L5, and L5-S1, the discogram showed no

disk herniation, no annular tear, no epidural leakage, and a normal opening and ending pressure.

R. 434.  A cervical spine MRI that day showed "no abnormalities . . . within the visualized

portion of the posterior fossa or within the cervical spinal cord."  R. 491.  A lumbosacral spine

MRI showed "no significant disc herniation, central canal stenosis, or neural foraminal stenosis"

---

[6]  Neuritis is the "inflammation of a nerve."  Stedman's at 1207.

[7]  An osteophyte is a "bony outgrowth or protuberance."  Stedman's at 1285.

and "lateral extension of contrast at L5-S1 without evidence of significant disc herniation." R. 492–93. On October 22, 2008, Decker received radiofrequency treatments with muscle injections, R. 428–30, 446–48, 453–57, to which he had "minimal response," R. 425. Decker received refills of pain medication from Dr. Abu-Ghanam and Dr. Hussein from November 2008–September 2009. R. 402–27.

Decker was treated at Crystal Run Healthcare by Dr. Zhi Qiao from June through October 2009. R. 368–401. Dr. Qiao found all systems normal and diagnosed diabetes mellitus. R. 395. Dr. Qiao noted that Decker's diabetes was poorly controlled in July and August, R. 377–93, but that in September 2009 it improved, R. 373.

At the request of his attorney, Decker was evaluated at the Division of Health and Family Services of the Sullivan County Department of Community Services for symptoms of depression. R. 340–59. Dr. Zhaniizha Kevii evaluated Decker in September 2008, and found that he was "verbal and cooperative," "presented as depressed," and "did not manifest symptoms of overt psychosis." R. 342. Decker saw various counselors and doctors there from October 2008 through March 2009 and was prescribed medications. R. 345–50. On April 1, 2009, Dr. Joseph Emmanuel evaluated Decker. R. 351. He found him well-oriented, with a euthymic[8] mood. Id. He found Decker's recent memory "mildly impaired," and his remote memory not impaired. Id. He diagnosed him with acute adjustment disorder[9] with depressed mood, and

_____

[8] Euthymia is a "moderation of mood, not manic or depressed." Stedman's at 627.

[9] Adjustment disorder is a "psychological response to an identifiable stressor or stressors that results in the development of clinically significant emotional or behavioral symptoms." Diagnostic and Statistical Manual of Mental Disorders ("DSM") 679 (4th ed., text revision 2000).

found his global assessment of functioning ("GAF")[10] score to be 51.  R. 352.  Dr. Emmanuel

reiterated these findings in April and June 2009.  R. 356, 358.

### 2.  Non-Medical Evidence

Decker completed a questionnaire for the New York State Office of Temporary and

Disability Assistance Division of Disability Determinations on February 25, 2008.  R. 147–158.

He stated that his daily activities consist of watching TV and that he could neither sit, stand, nor

lie down for long periods.  R. 148.  He claimed he sometimes needs help tying his shoes and

sometimes needs help in the shower.  R. 148–49.  He stated that he goes outside twice a week

and that he could not drive because "using [his] legs to drive made [his] back hurt more."  R.

150.  He stated that when he goes shopping he uses "the motorized wheelchair."  R. 151.  He

sees relatives a few times per month.  R. 152.

### 3.  The November 17, 2009 Hearing

On November 17, 2009, Decker testified before ALJ Gonzalez.  R. 22–63.  Decker's

attorney, Gary Gogerty, was present.  R. 24.  Decker testified that he received a twelfth grade

education, and that he lived with his girlfriend and a son.  R. 26–28.  He stated that he had

another son who spent weekends with him.  R. 28.  He testified that he had not worked since

November 2006 and that he stopped working because he "thought [he] pulled a muscle in [his]

back but it was further than a muscle pull, . . . [and has] been hurting ever since."  R. 27.  His

girlfriend receives disability payments and they receive food stamps.  Id.  Decker had made a

---

[10]  The GAF scale reports an individual's "psychological, social, and occupational
functioning" and is "particularly useful in tracking the clinical progress of individuals in global
terms, using a single measure."  DSM at 32.

worker's compensation claim at the time he stopped working but the claim was denied.  R.

28–29.

Decker testified about his previous jobs.  R. 29–32.  In 1998, he worked on the

production line of a factory, lifting sheets of up to 25 pounds.  R. 29–30.  In 2001, he worked for

a fence company, lifting rolls of fence of 75 to 100 pounds, mixing cement, and shoveling.  R.

30.  Also in 2001 he worked as a deliveryman for a fish company, delivering boxes of 75 to 150

pounds.  R. 30.  From 2003 to 2005 he worked as a bed assembler, lifting 50 to 75 pounds.  R.

31.  In 2005 and 2006, he worked in a plumbing warehouse, stocking shelves, driving a forklift,

and loading and unloading trucks.  R. 31–32.  His last job was in a company warehouse, where

he started out in the metal shop, heating boxes and cutting steel, and then moved to the

warehouse to do plumbing work.  R. 32.

Decker testified that he drives his car a few times a week.  R. 33.  He has not been on any

vacations or left the area since 2006.  Id.  He testified that he stopped attending counseling

because the counselors "were very judgmental."  R. 34–35.  He testified regarding his diabetes,

asthma, and lower back problems.  R. 34–38.  He stated that his asthma is worse in cold weather,

and that he has never been hospitalized for his asthma.  R. 35–36.  He measures his blood sugar

multiple times a day and takes various medications for his diabetes.  R. 37.  He told the ALJ that

his back was "always hurting" and that the pain was mostly in his left lower back.  Id.  He

indicated that he has trouble sitting still and said "I got to sit, I got to stand, I got to move."  Id.

He described the pain as "sharp, shooting pains which constantly in my back [sic], goes down

right through my legs and out my toes.  I get numbness in my toes, shooting pains, throbbing."

R. 38.  He said his medications "take the . . . edge off [the back pain] a little bit," id., but only for

up to half an hour.  R. 39.  When he does not take the medication, he cannot move, and he

described the pain as "at least a nine" on a scale of one to ten, with ten being excruciating pain. R. 38. With the medication, he rated his pain as an eight on the same scale. Id. He stated that physical therapy did not work but that use of a "TENS unit . . . helps a little bit . . . but not anything amountable [sic]." R. 41. He said the epidural he received "didn't work at all." R. 45–46. He described having difficulty sleeping due to his back pain. R. 41. He does not help with chores around the house or cooking. R. 41–42. He shops with his girlfriend once in a while. R. 43. He rarely uses the computer because the seated position hurts his back. Id.

Decker stated that he takes Cymbalta for his depression. R. 47. He takes a muscle relaxer for his back pain. R. 48. He has not tried to work. R. 49.

David Sypher, a vocational expert, also testified at the ALJ hearing. R. 49–61. He stated that his testimony would be consistent with the Dictionary of Occupational Titles ("DOT") and its companion publication Selected Characteristics of Occupations. R. 51. The ALJ asked Sypher the following question:

> I'd like you to assume a hypothetical person the claimant's age, education and work history. I want you to further assume that that person has a residual functional capacity to occasionally, and I'm going to define occasionally as up to one-third of the workday. Occasionally lifting, carry 20 pounds, frequently, which I'll define as up to two-thirds of the workday, frequently lift and carry 10 pounds. This person can sit about six hours in an eight-hour workday and can stand and/or walk about six hours in an eight-hour workday. And also there's occasional limitations posturally and I'll define them for you, that this person can, can occasionally climb, balance, stoop, kneel and crouch. That also that this person must avoid fumes, odors, dust, gases and poor ventilation. Could such a person do any of the claimant's past relevant work as actually performed by the claimant or is [sic] generally performed in the national economy?

R. 51–52. Sypher identified three jobs that such an individual could perform: that of cashier/checker, that of taxi dispatcher, and that of electrical assembler. R. 52–53. The ALJ then amended the hypothetical question, adding "the limitation that this person could only perform simple, routine tasks." R. 53. Sypher testified that such an individual could not do

10

Decker's past relevant work, but could still perform the job of electrical assembler.  R. 54.

Sypher stated that there were 115,230 of these jobs nationally, 15,170 statewide, and 440 locally.

R. 53.  The ALJ then posed another hypothetical to Sypher:

> Assume a hypothetical person the claimant's age, education and work history and further
> assume that such a person has a residual functional capacity for sedentary work and that
> that person must engage in simple, routine tasks and that that person must also
> occasionally, which I'm also going to define as up to one-third of a workday, engage in
> postural limits which is climbing, balancing, stooping, kneeling, crouching and crawling.

R. 54.  Sypher testified that there are no jobs that such an individual could perform.  R. 54–55.

Gogerty then questioned Sypher.  R. 56–60.  Gogerty asked several questions about the

program used by Sypher in identifying the jobs and job numbers in his testimony and the

methods used to obtain these numbers.  R. 56–59.  Gogerty questioned Sypher as to whether the

number of jobs in the local economy would be impacted by "the current economic situation in

the country."  R. 57–58.  Sypher responded that "certainly there is that possibility.  This

particular occupation they've got the numbers[,] that's an accurate, accurate number."  R. 58.

Gogerty requested that the publication from which Sypher was producing numbers be produced.

R. 60.  The ALJ reserved his ruling on that issue.  Id.

### 4.    The ALJ's Decision

On December 9, 2009, the ALJ issued a decision denying Decker's request for disability

insurance benefits.  R. 14–21.  First, the ALJ discussed whether the vocational expert was

required to produce copies of the materials he used during the hearing.  R. 14.  The ALJ held that

the vocational expert was not required to produce these materials because they were not

"necessary for adjudicatory purposes" and "Counsel had a full and fair opportunity to cross-

exam the vocational expert at the hearing."  R. 14.  The ALJ's findings of fact and conclusions

of law are as follows:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.  The claimant has not engaged in substantial gainful activity since November 20, 2006, the alleged onset date . . . .

3.  The claimant has the following severe impairments: back injury; depression; asthma and diabetes . . . .

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) . . . .

5.  [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can occasionally climb, balance, stoop, kneel, crouch and crawl and should avoid concentrated exposure to dust, fumes, odors, gases and poor ventilation.  He is limited to simple, routine tasks. . . .

6.  The claimant is unable to perform any past relevant work. . . .

7.  The claimant was born on February 4, 1977 and was 29 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . .

11.  The claimant has not been under a disability, as defined in the Social Security Act, from November 20, 2006 through the date of this decision (20 CFR 404.1520(g)).

R. 16–21.  With regard to the ALJ's fourth finding, the ALJ determined that Decker's mental

impairment did not meet or medically equal the criteria for affective disorders under 20 C.F.R.

Part 404, Subpart P, Appendix 1.  R. 16–17.  Specifically, the ALJ found that Decker's

impairments are mild to moderate and that these impairments did not "cause at least two

'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation." R.
17.

As to the ALJ's fifth finding, the ALJ's conclusions were based in part on a
determination that Decker's testimonial "statements concerning the intensity, persistence and
limiting effects of these symptoms are not credible to the extent they are inconsistent with the
. . . residual functional capacity assessment." R. 18. The ALJ stated that with regards to
Decker's subjective complaints, "the medical evidence does not substantiate the allegations of
the claimant to the degree alleged." Id. The ALJ also found that Decker's "allegations of
disabling psychological limitations are also not supported by the record" because treatment for
these limitations was not sought until his attorney's request and all treatment reports showed
normal mental functioning. R. 19. The ALJ further noted that the record contains no treating
source opinion supporting a more limited residual functional capacity ("RFC"). Id.

As to the ALJ's tenth finding, the ALJ explained that he based his findings on the
vocational expert's testimony that Decker could, assuming he had certain characteristics posited
by the ALJ, perform the requirements of the occupation of electrical assembler, DOT # 729.687-
010, of which there are 215,000 jobs nationally and 15,170 in the state. R. 21. The ALJ
observed that pursuant to SSR 00-4p, this testimony was consistent with the information
contained in the DOT. Id. The ALJ concluded that Decker is "capable of making a successful
adjustment to other work that exists in significant numbers in the national economy." Id.

II.    SCOPE OF JUDICIAL REVIEW UNDER 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining
whether the [Commissioner's] conclusions were supported by substantial evidence in the record
and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013)

(citation and internal quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127–28 (2d Cir. 2008); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127–28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists."  Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)).  The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise."  Id. (emphasis in original) (citation and some internal punctuation omitted).  "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted).

14

III.   STANDARD GOVERNING EVALUATIONS OF DISABILITY CLAIMS BY THE
       AGENCY

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person

will be found to be disabled only if it is determined that his "impairments are of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy."  Id. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that

the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. § 404.1520(a)(4); see

also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must

determine whether the claimant is currently engaged in any "substantial gainful activity."  20

C.F.R. § 404.1520(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful activity,

the Commissioner must decide if the claimant has a "severe medically determinable physical or

mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of

impairments that "significantly limits [the claimant's] physical or mental ability to do basic work

activities . . . ."  Id. § 404.1520(c).  Third, if the claimant's impairment is severe and is listed in

20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the

claimant must be found disabled regardless of his age, education, or work experience.  Id.

§ 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment is not listed and is not equal to one of

the listed impairments, the Commissioner must review the claimant's residual functional

capacity to determine if the claimant is able to do work he or she has done in the past, i.e., "past

relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or she is not

disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the Commissioner

must decide if the claimant's residual functional capacity permits the claimant to do other work.

Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed

disabled.  Id.  The claimant bears the burden of proof on all steps except the final one — that is,

proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303,

306 (2d Cir. 2009) (per curiam).

IV.    ANALYSIS

Decker seeks reversal of the ALJ's determination or, in the alternative, remand for

further fact finding, on four grounds: (1) that the ALJ failed to set forth his RFC finding in a

manner sufficient to allow a reviewing court to carry out its reviewing function, see Pl. Mem. at

6–11; (2) that the ALJ erred in assessing the claimant's credibility and failed to evaluate his

subjective complaints properly, see Pl. Mem. at 11–14; (3) that the ALJ failed to develop the

administrative record, see Pl. Mem. at 14–17; and (4) that the Commissioner failed to meet his

burden at step five of the sequential evaluation process, see Pl. Mem. at 17–24.  We discuss each

separately.

16

A.   Whether the ALJ Failed to Set Forth his RFC Finding in a Manner Sufficient to Allow a Reviewing Court to Carry Out its Reviewing Function

Decker argues that the ALJ failed to adequately explain his RFC finding because he failed to provide a "function-by-function" assessment of Decker's ability to do work "on a regular and continuing basis."  Pl. Mem. at 7 (quoting SSR 96-8p).  In support of his position, Decker cites cases in which courts remanded the decisions of an ALJ because of the ALJ's failure to identify an individual's functional limitations.  Def. Mem. at 20–21 (citing, inter alia, Murphy v. Barnhart, 2003 WL 470572, at *9 (S.D.N.Y. Jan. 21, 2003) (remanding case where the ALJ failed to consider plaintiff's inability to use her right hand and her use of a cane)).  Here, however, the ALJ carefully reviewed, considered, and explained all of Decker's physical and mental limitations.  In his decision, the ALJ specifically described Decker's ability to "occasionally climb, balance, stoop, kneel, crouch and crawl" and reviewed all the pertinent medical evidence.  R. 17–19.  Moreover, the Second Circuit has never held that an ALJ must conduct "a function-by-function analysis, and the Third and Sixth Circuits have specifically ruled that such an analysis is not required."  Daniels v. Astrue, 2012 WL 1415322, at *12 (S.D.N.Y. Apr. 18, 2012) (citing Dillingham v. Astrue, 2010 WL 3909630, at *11 (N.D.N.Y. Aug. 24, 2010), adopted, 2010 WL 3893906 (N.D.N.Y. Sept. 30, 2010)); Diaz v. Astrue, 2010 WL 3257779, at *8–9 (S.D.N.Y. Aug. 17, 2010)).  We agree with those courts concluding that there is no per se requirement that an ALJ perform a "function-by-function" analysis.  See Daniels, 2012 WL 1415322, at *12–13; Juliano v. Astrue, 2012 WL 1232961, at *8 (S.D.N.Y. Apr. 12, 2012) ("[T]he ALJ's written opinion need not discuss each function, especially those functions for which no limitation is alleged."); Novak v. Astrue, 2008 WL 2882638, at *3

17

(S.D.N.Y. July 25, 2008); Casino-Ortiz v. Astrue, 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007), adopted, 2008 WL 461375 (S.D.N.Y. Feb. 20, 2008).

Decker also argues that the ALJ improperly discounted Decker's credibility because his alleged symptoms were inconsistent with the ALJ's RFC finding, instead of determining Decker's RFC after taking Decker's alleged symptoms into account.  Pl. Mem. at 10–11 (citing, inter alia, Taiano v. Astrue, 2010 WL 3921805, at *3 (E.D.N.Y. Oct. 1, 2010)).  We reject this argument because the ALJ stated that he reached his conclusion "after careful consideration of the entire record," R. 17, including Decker's testimony and objective medical findings, see id. ("In making [the RFC] finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence").  The basis of Decker's argument that the ALJ evaluated Decker's credibility after determining Decker's RFC is the ALJ's statement that he found Decker's testimony about his symptoms to be incredible "to the extent they are inconsistent with the above residual functional capacity assessment."  R. 18.  Read in context, however, this statement does not indicate that the RFC assessment was made without regard to Decker's subjective complaints.  Instead, the ALJ's decision specifically details aspects of Decker's testimony that were not supported or were contradicted by other evidence in the record, regarding both Decker's physical and mental limitations.  R. 17–19.  It is thus clear that the ALJ made the RFC determination after taking Decker's alleged symptoms into account.

 

B.      Whether the ALJ Erred in Assessing the Claimant's Credibility and Failed to Evaluate his Subjective Complaints Properly

Decker alleges that the ALJ's credibility determination is "largely conclusory and not supported by substantial evidence," Pl. Mem. at 12, and that the ALJ improperly made credibility determinations "by picking and choosing the portions of the treatment record while ignoring the portions that deal with Mr. Decker's severe impairments."  Pl. Mem. at 13.  The Second Circuit has held that where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  Williams v. Bowen, 859 F.2d 255, 260–61 (2d Cir. 1988) (citing Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)); accord Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).  The ALJ must make this determination "in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."  Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984).  Nonetheless, an ALJ does not have to "reconcile explicitly every conflicting shred" of medical evidence.  Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983)).  Where an ALJ gives specific reasons for finding the claimant not credible, the ALJ's credibility determination "is generally entitled to deference on appeal."  Selian, 708 F.3d at 420.

The Social Security Administration ("SSA") has issued a regulation relating to reports of pain or other symptoms by a claimant for disability benefits.  See 20 C.F.R. § 416.929(c).  This regulation provides, inter alia, that the SSA "will not reject [a claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work . . . solely because the available objective medical evidence does not substantiate [his] statements."  Id. § 416.929(c)(2).  The regulations also provide that the SSA "will consider whether there are any inconsistencies in the evidence and the extent to which

there are any conflicts between [his] statements and the rest of the evidence."  Id. § 416.929(c)(4).

Decker cites cases in which the ALJ's determination was remanded because the ALJ required objective evidence of pain, see Meadors v. Astrue, 370 F. App'x 179, 184–85 (2d Cir. 2010), or required a treating physician's medical opinion to be supported by objective clinical findings, see Cruz v. Sullivan, 912 F.2d 8 (2d Cir. 1990).[11]  Here, however, the ALJ did not impose such additional requirements.  The ALJ specifically found that Decker's impairments could reasonably be expected to cause the alleged symptoms, but that Decker's statements about the extent of these symptoms were not credible.  R. 18.  Specifically, the ALJ found (1) that Decker alleged disabling back pain but had never undergone surgery or hospitalizations for his condition, and that MRI studies showed "only mild findings with no evidence of any disc herniations or stenosis;" (2) that Decker has diabetes but has no history of organ damage or hospitalizations for this condition; (3) that Decker has asthma but that he has never received "significant treatment for this condition," and (4) that Decker has alleged psychological limitations but that all examinations of his mental functioning have been normal.  R. 19.  These conclusions were amply supported by evidence in the record.  See, e.g., R. 267, 276, 351–52, 397, 491–93.

Decker's allegations that the ALJ selectively relied on certain portions of the treatment record to the exclusion of other portions in determining Decker's credibility also does not merit

---

[11]  While this case does not involve a treating physician's opinion, we note that the Social Security regulations have been revised since the ruling in Cruz to require that a treating physician's opinion of the severity of an impairment be "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993) (approving 20 C.F.R. § 404.1527(d)(2)).

reversal.  The ALJ examined and discussed treatment reports from Dr. Dunkelman, Dr. Hussein, the Pain Control Center, Liberty Medical Group, Crystal Run Healthcare, Dr. Rocker, and the Sullivan County Department of Community Services.  R. 18–19.  Decker does not identify any specific portions of the record which the ALJ failed to consider or to which the ALJ did not give adequate weight.

In his Reply, Decker adds a claim that the ALJ substituted his own opinion for a competent medical opinion.  Pl. Reply at 4.  Specifically, Decker argues that the ALJ's findings were inconsistent with the reports of Dr. Abu-Ghanam.  Id. at 4–6.  This argument lacks merit.  First, the quotations from Dr. Abu-Ghanam's reports which Decker points to in support of this argument are not inconsistent with the ALJ's findings.  Compare R. 425 ("status post lumbar with positive discogram at L4-L5 and L5-S1") with R. 18 ("A discogram performed in August 2008 showed no significant disc herniation or stenosis.") (emphasis added).  There is nothing in these isolated quotations that contradict the ALJ's summary of the medical evidence.  Moreover, Decker omits the context for these quotations and unfairly characterizes them as Dr. Abu-Ghanam's "opinions."  In reality, many of these quotations are Dr. Abu-Ghanam's recording of statements made by Decker.  See, e.g., R. 406 ("He reports . . . more lower extremity pain and numbness which is off and on.") (emphasis added).

Decker's brief also argues that the ALJ failed to provide "good reasons in his decision for the weight given to treating physician's opinion" and that the Commissioner attempted to provide a post hoc rationalization for this decision and others.  Pl. Reply at 6–7.  Here, however, there is no treating physician's opinion that the ALJ failed to credit, as the ALJ specifically noted.  See R. 19 ("There is no treating source opinion which specifically supports a more limited residual functional capacity.").

21

In sum, because the ALJ could properly find Decker's testimony about his pain to be not credible, "we find no error in the ALJ's conclusion that pain did not deprive [Decker] of a meaningful employment opportunity."  Selian, 708 F.3d at 422.

C.      Whether the ALJ Failed to Develop the Administrative Record

Decker also argues that the ALJ failed to adequately develop the administrative record. Pl. Mem. at 14.  In explaining this argument, however, Decker repeats his claim that the ALJ failed to consider his subjective pain and selectively relied on the medical record — propositions we have already rejected for the reasons stated above.  Notably, Decker fails to point to any specific evidence that the ALJ failed to either consider or obtain.  As the Commissioner points out, the ALJ considered "sixteen medical exhibits, comprising 294 pages of records[;] . . . [r]ecords were obtained from all of plaintiff's treating sources . . . , and the record was further developed with a consultative examination at the expense of the Social Security Administration . . . , and with the testimony of a vocational expert."  Comm. Mem. at 29.  Decker has identified no doctor, record, or examination results that the ALJ failed to consider as part of the record.

Decker argues that "the ALJ has a duty to 'seek additional evidence or clarification from [the] medical source when a report from [that] medical source contains conflict or ambiguity that must be resolved.'"  Pl. Mem. at 16 (citing 20 C.F.R. § 404.1512(e)(1)).  This argument is inapposite as the ALJ did not find that any of the reports from a particular medical source contained conflicting or ambiguous information.  Indeed, Decker has not identified any medical report in his case that meets these criteria.[12]

_____

[12]  We note also that the regulation Decker cites has been eliminated.  See 77 Fed. Reg. 10,651-01 (Mar. 26, 2012) ("We are modifying the requirement to recontact your medical source(s) first when we need to resolve an inconsistency or insufficiency in the evidence he or she provided.  Depending on the nature of the inconsistency or insufficiency, there may be other,

D.     Whether the Commissioner Failed to Meet His Burden at Step Five of the
       Sequential Evaluation Process

Decker argues that the Commissioner failed to demonstrate that work that Decker can

perform exists in significant numbers and therefore did not meet his burden under the fifth step

of the sequential evaluation process.  Pl. Mem. at 17.  Decker asserts that the ALJ relied on

"unreliable vocational expert testimony" and presents several objections to the vocational

expert's testimony.  Pl. Mem. at 17–23.

First, Decker argues that the requirement that experts use reliable methods "plays a role

in the administrative process because every decision must be supported by substantial evidence."

Id. at 20.  Decker repeatedly questions the validity of materials relied on by Sypher.  Pl. Mem.

17–23.  However, an ALJ may consider evidence at a hearing "even though the evidence would

not be admissible in court under the rules of evidence used by the court."  20 C.F.R.

§ 404.950(c).  Additionally, it has been held that a vocational expert's "recognized expertise

provides the necessary foundation for his or her testimony."  Pena v. Astrue, 2008 WL 5111317,

at *10 (S.D.N.Y. Dec. 3, 2008) (citing Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005)).

Decker also argues that the vocational expert failed to provide a description of the job of

which he found Decker capable of performing, in violation of the Second Circuit's ruling in

Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978).  Pl. Mem. at 23.  This argument lacks

merit.  In Bastien, it was necessary to clarify that the job the claimant was alleged to be capable

of performing did not require a higher RFC than the claimant actually had.  572 F.2d at 912–13.

Here, Sypher identified a job in response to a question specifically detailing an individual with

Decker's RFC.  R. 51–54.  Sypher pointed to a particular job within the DOT, # 729.687-010,

more appropriate sources from whom we could obtain the information we need.").

which he called "electrical assembler." R. 53. He testified that this job required the RFC contained in the ALJ's hypothetical question. Id. Thus, Decker's physical and mental limitations were considered by Sypher in his identification of a job which Decker could perform.

Decker further argues that Sypher's testimony was unreliable because the DOT number given by Sypher consists of a collection of jobs, and therefore the numbers he gave about the existence of jobs within the economy which Decker could actually perform is incorrect. Pl. Mem. at 20–21. But the DOT provides the "maximum requirements" for jobs. See SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000). Thus, while a job within a certain collection may have fewer requirements than a job which the claimant is capable of doing, it would not have additional requirements. See generally Brault, 683 F.3d at 447–51 (upholding the process by which a vocational expert obtained numbers of jobs based on DOT titles). Therefore, Sypher's testimony necessarily meant that Decker could perform each of the "collection" of jobs Sypher identified. For these reasons, the ALJ's conclusion that there were sufficient jobs in the economy was supported by substantial evidence.

## V.    CONCLUSION

The Commissioner's motion for judgment on the pleadings (Docket # 14) should be granted, and Decker's motion for judgment on the pleadings (Docket # 11) should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the

Court, with copies sent to the Hon. Paul G. Gardephe, at 40 Centre Street, and to the

undersigned, at 500 Pearl Street, New York, New York 10007.  Any request for an extension of

time to file objections must be directed to Judge Gardephe.  If a party fails to file timely

objections, that party will not be permitted to raise any objections to this Report and

Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP

v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir.

2010).

Dated:  April 19, 2013
         New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

25